### UNITED STATES  DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**HUMBERTO VARGAS**                                **CIVIL ACTION**

**versus**                                                        **NO. 12-2817**

**STEVE RADER, WARDEN**                      **SECTION: "F" (3)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Humberto Vargas, is a state prisoner incarcerated at the Dixon Correctional Institute, Jackson, Louisiana.  On December 16, 2008, he pleaded guilty to forcible rape and aggravated burglary under Louisiana law and was sentenced on each conviction to a concurrent term of twenty years imprisonment.[1]  On May 10, 2011, after he was granted an out-of-time appeal,[2] the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences but remanded

---

[1] State Rec., Vol. I of VI, transcript of December 16, 2008; State Rec., Vol. I of VI, minute entry dated December 16, 2008; State Rec., Vol. II of VI, guilty plea form.

[2] See State Rec., Vol. I of VI, Order dated January 8, 2010.

the matter for a clarification concerning the sentence on the forcible rape conviction.[3]  On June 23, 2011, the state district court clarified that the first two years of the forcible rape sentence were to be served without benefit of probation, parole, or suspension of sentence.[4]

In the interim, petitioner filed an application for post-conviction relief with the state district court on or about May 26, 2011.[5]  That application was denied on March 15, 2012.[6]  His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on May 25, 2012,[7] and by the Louisiana Supreme Court on October 8, 2012.[8]

Petitioner thereafter filed the instant federal application for *habeas corpus* relief.[9] The state concedes that the application is timely and that petitioner exhausted his remedies in the state courts.[10]

---

[3] State v. Vargas, 66 So.3d 29 (La. App. 5th Cir. 2011) (No. 10-KA-788); State Rec., Vol. I of VI.

[4] State Rec., Vol. I of VI, minute entry dated June 23, 2011.

[5] State Rec., Vol. I of VI.

[6] State Rec., Vol. I of VI, Order dated March 15, 2012.

[7] State v. Vargas, No. 12-KH-341 (La. App. 5th Cir. May 25, 2012); State Rec., Vol. I of VI.

[8] State *ex rel.* Vargas v. State, 98 So.3d 853 (La. 2012) (No. 2012-KH-1358); State Rec., Vol. VI of VI.

[9] Rec. Doc. 3.

[10] Rec. Doc. 8, p. 4.

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." <u>Bell</u>, 535

U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases. A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways. First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Court's cases but unreasonably applies it to the
> facts of the particular state prisoner's case. Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

<u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an

- 4 -

incorrect one."  Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."),

cert. denied, 132 S.Ct. 1537 (2012).

> While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

- 5 -

## II.  Petitioner's Claims

### A. Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective.  The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.  Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the

- 6 -

conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to satisfy the prejudice prong of an ineffective assistance of counsel claim in a case involving a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also James v. Cain, 56 F.3d 662, 667 (5th Cir. 1995).

Ineffective assistance of counsel claims present a mixed question of law and fact; therefore, when the state courts have rejected such claims on the merits, a federal *habeas* court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court has explained that, under the AEDPA, federal *habeas corpus* review of such ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 785-86 (2011) (citation omitted). The Supreme Court then explained:

Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

- 8 -

Id. at 788 (citations omitted; emphasis added).  For the following reasons, it is clear that petitioner

has not made the showing required to overcome those stringently deferential standards of review in

the instant case.

In the post-conviction proceedings, the state district court rejected petitioner's

ineffective assistance of counsel claim, holding:

> [D]efendant argues that he received ineffective assistance of counsel before, during, and after proceedings from misleading advice, offending due process, and equal protection.  The defendant alleges ineffective assistance of counsel in that counsel did not prepare a defense, did not investigate or file motions, did not subpoena witnesses, did not review the district attorney's files, and encouraged him to plea guilty of [sic] would serve life in prison.
>
> As the State surmises in its response, the only issue in post-conviction relief as to ineffective assistance of counsel in review of defendant's guilty plea is whether the guilty plea was intelligently and voluntarily entered and with the advice of competent counsel.  Tollett v. Henderson, 411 U.S. 258, 93 S. Ct. 1602, 26 L.Ed. 235 (1973).  Furthermore, a plea of guilty normally waives all non-jurisdictional defects in the proceedings prior to the plea.  State v. Crosby, 338 So.2d 584, 586 (La. 1976).  It is well settled that a validly entered guilty plea waives any right a defendant might have had to question the merits of the state's case and the factual basis underlying the conviction.  State v. Lemon, 923 So.2d 794, (La. App. 5 Cir. 2/14/06). (citing State v. Bourgeois, 406 So.2d 550, 552 (La. 1981); State v. Lewis, 01-490 (La. App. 5 Cir. 10/30/01), 800 So.2d 1032, 1035.)
>
> In this case, the Waiver of Constitutional Rights form, signed by the defendant, his attorney, and the trial judge, contains a written record of the trial court's advice of constitutional rights, as in the Boykin transcript.  The defendant clearly acknowledges in writing and on the court record that he understood his sentence to this charge would be 20 years.  He acknowledges that he had not been forced, coerced, or threatened to enter the plea and that he was satisfied with the way the court and his attorney had handled his case.  There is no evidence whatsoever to cast any doubt on the voluntariness of the plea.

In cases where the defendant has pled guilty, he must prove that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The voluntariness of the guilty plea depends upon whether counsel's advice was within the wide-range of competence demanded of attorneys in criminal cases. State *ex rel* Graffagnino v. King, 436 So.2d 559 (La. 1983).

Under the well-known test of Strickland v. Washington, 466 U.S. 668 (1984), to be successful in arguing ineffective assistance of counsel, a petitioner must prove deficient performance to the point that counsel was not functioning as counsel within the meaning of the Sixth Amendment. A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted. There is a strong presumption that counsel's performance is within the wide range of effective representation. Effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance based on hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.

In this case, the defendant makes no allegations relating to his sworn admission to the crimes charged. It was through defendant's attorney's intervention that a negotiated plea was entered. This agreement reduced the charge and significantly reduced the defendant's sentencing exposure from the mandatory life sentence plus thirty years, and a multiple bill would have increased sentencing even more. The record reflects that the State was prepared to present overwhelming evidence of defendant's guilt, including evidence of other crimes against the victim. The defense attorney was aware of this evidence and sought a favorable plea. After a full review of the record, the court concludes that counsel's performance was not ineffective. The defendant fails to prove either prong of Strickland.[11]

In ruling on petitioner's related writ application, the Louisiana Fifth Circuit Court of Appeal likewise held:

Relator ... claims that he received ineffective assistance of counsel. He asserts that neither he nor his family members were able

---

[11] State Rec., Vol. I of VI, Order dated March 15, 2012.

to contact his appointed counsel.  Relator also claims that his counsel never responded to his requests to meet with him, never investigated his case to find evidence, never interviewed witnesses, and never contacted him to prepare a defense.  Relator further claims that his counsel failed to review the State's files to find that there was insufficient evidence or to prevent violations of his constitutional rights.  According to relator, his counsel advised him to plead guilty in order to avoid a life sentence.  Relator asserts that, if his counsel would have properly informed him of the defenses to the charged offenses, he would have insisted on going to trial.

A criminal defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution.  State v. Johnson, 08-1156, p. 13 (La. App. 5 Cir. 4/28/09), 9 So.3d 1084, 1092, writ denied, 09-1394 (La. 2/26/10), 28 So.3d 268.  A defendant must prove both that 1) his attorney's performance was deficient, and 2) he was prejudiced by the deficiency in order to establish ineffective assistance of counsel.  Id., 08-1156 at 13, 9 So.3d at 1092-93, citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075, writs denied, 94-0475 (La. 4/4/94) 637 So.2d 450 and 94-1361 (La. 11/4/94), 644 So.2d 1055.  "An error is prejudicial if it was so serious as to deprive a defendant of a fair trial, or 'a trial whose result is reliable.'"  Johnson at 13, 9 So.3d at 1093, quoting Strickland, 466 U.S. at 686, 104 S.Ct. at 2064.  In order to show prejudice, a defendant must demonstrate that but for counsel's unprofessional conduct, the outcome would have been different.  Johnson at 13, 9 So.3d at 1093, citing Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; Soler, supra.

In the present case, relator does not indicate what his counsel should have investigated, what material evidence was not found, what unnamed witnesses should have been interviewed, what defense he believed his counsel should have asserted, or how additional contacts between he or his family and his attorney would have changed the outcome of his case.  In addition, as noted by the trial court, the guilty plea and sentencing transcript and the waiver of rights form indicate that relator was advised of his Boykin rights.  Relator also signed the waiver of rights form indicating that he committed the crimes; that his guilty plea was a knowing, intelligent, free, and voluntary act; and that he was satisfied with the explanations given by his attorney and the trial judge.  Relator also received the sentence agreed upon, as part of his plea bargain.  Therefore, we find that the

trial court did not err in finding that relator failed to prove either prong of the <u>Strickland</u> test to meet his burden of proving his ineffectiveness of counsel claim.[12]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[13]

This Court need not determine whether counsel's performance was in fact deficient in the respects petitioner alleges because the instant claim clearly fails on the prejudice prong of the <u>Strickland</u> analysis. As noted, "[a] prisoner claiming counsel's ineffectiveness rendered his guilty plea involuntary must show: 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" <u>United States v. Fernandez</u>, 317 Fed. App'x 388, 389 (5th Cir. 2009) (*quoting* <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985)). In the instant case, the Court finds that, despite petitioner's allegation to the contrary,[14] there is no reasonable probability that he would have insisted on going to trial for the following reasons.

First, there was little doubt that petitioner would be convicted at trial. His identity as the perpetrator was not at issue and, as the state court noted, the evidence against him was overwhelming. For example, on direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the underlying facts of this case and the evidence against petitioner:

> As this matter did not proceed to trial, the pertinent facts were deduced from the direct examination of the victim at the preliminary

---

[12] <u>State v. Vargas</u>, No. 12-KH-341 (La. App. 5th Cir. May 25, 2012); State Rec., Vol. I of VI.

[13] <u>State *ex rel.* Vargas v. State</u>, 98 So.3d 853 (La. 2012) (No. 2012-KH-1358); State Rec., Vol. VI of VI.

[14] <u>See</u> Rec. Doc. 3, p. 15.

examination hearing held on October 19, 2006.  At that time, the victim stated that she met defendant at a party sometime in February of 2005, and they dated for about two and a half months.  Shortly after they started dating, defendant began to ask the victim to marry him to which she responded maybe.  However, the victim ended the relationship because she felt he was not a suitable partner.

The victim explained that the defendant would follow her around and "always impulse his presence" even when she wanted to be alone.  She further testified that when she ended the relationship, she told him that she wanted nothing more to do with him to which defendant responded "no, no" because he wanted to marry her on May 26, 2005, which was her birthday.  The victim again instructed the defendant that the relationship was over because he continued to contact her at work and "he would talk bad about her and say that she was a bad person."[FN2]

[FN2] The victim testified through an interpreter.

After the victim ended the relationship, defendant would continue to contact her.  He brought her flowers to work to get her to change her mind.  Additionally, he would call her at work, home, as well as on her cell phone, where he would leave numerous harassing messages.  She then expressed that defendant would leave messages on her phone calling her a "disgraceful bitch, not worth anything." When the victim asked defendant to stop calling her, he ignored her requests and continued to call.

Initially, the victim did not call the police about the harassment.  However, she did call the police in May of 2005, when the defendant met her unannounced at the airport where the victim was returning from visiting her mother in Guatemala.  She did not notify defendant of her travel plans; however, the departure and return dates were written down in her calendar at home.  The defendant broke into her house and retrieved the information.  When the victim returned home, she found her bathroom on the second floor dirty and the victim's neighbor informed the victim that she heard noises in the apartment but she was afraid to enter.

At the airport, the defendant began "accosting" the victim: pulling her arm, insulting her, telling her she was "disgraceful", and that she had to leave with him because he needed to speak with her. Security personnel noticed the situation, escorted the victim safely to her brother, who picked her up, and instructed her to call the police.

When the victim arrived at home, she observed the defendant driving around her block.  She called the police, and her neighbor, Maria Paniaqua, assisted her in explaining the incident to the police because she did not speak English well enough.  When the policemen arrived on the scene, the defendant was not in the area; however, he started calling her on the phone instead.  At that time, the police officers instructed the victim to change her locks and to call again if she saw defendant near or if he began to harass her again.

On a separate occasion, also in May of 2005, the victim's friend and neighbor, Maria Paniaqua, called the police because the defendant chased the victim in her vehicle.  When the victim was leaving work, she observed defendant in his vehicle at the corner near a Taco Bell.  The defendant chased behind the victim in his vehicle and she became very nervous.  She drove around the back of her house where defendant hit her vehicle.  The victim called Ms. Paniaqua, who came outside.  As the victim turned the corner, the defendant hit her vehicle for a second time.  The defendant then began banging on the windows of her vehicle while he was saying that she was "disgraceful, bewitched, [and] that he was going to kill [her]."

When Ms. Paniaqua called the police, the defendant left.  One of the policemen who arrived on the scene was the same officer who was called out the first time victim called the police.  This officer called defendant on his cell phone and told him that he needed to stop following the victim, and that he wanted to talk to the defendant.  The defendant told the police officer that he had done nothing.  The police officers took pictures of the damage to the victim's car and left the scene.

The defendant continued to harass the victim.  Specifically, he threw rocks at her windows and her eight-year-old daughter got so scared she started crying and hid underneath the table.  The victim testified that she did not call the police because the young men in the neighborhood vowed to protect her.  The defendant would call her and accuse her of having sexual relationships with the men and that was the reason why they were protecting her.  On that particular day, one of the young men came outside and defendant left.  The victim further testified that defendant continued to watch her and he would let her know he was watching her by calling and telling her who she was talking to on the phone or what she was doing at that particular time.

On June 2, 2005, the victim was working at Maria's Hair Salon, in Metairie, and defendant called her at work at around 11:00

a.m.  The victim's co-worker told defendant that she was not there so he hung up and called back around 1:00 p.m.  The victim's co-worker again told defendant that she was not there, but included that she would come back because she left her car there, reasoning that defendant may have been outside watching the victim.  The victim left the salon at approximately 3:40 p.m.

The victim went straight home because she was afraid of defendant following her.  When she got home she locked her doors with double locks also using the chain.  When she turned around, she observed defendant in the middle of her kitchen so she asked him what he was doing there.  Defendant grabbed the victim by her hair and began insulting her and hitting her.  The victim started screaming knowing the owner of the apartment was there, because her neighbor, Ms. Paniaqua, moved out.  Defendant then turned on the television very loudly so that no one could hear the altercation.  Defendant then put a pillow over the victim's face to choke her as he said: "Die you disgraceful woman, die."

The defendant began to drag the victim to the second floor, the victim refused, so he then attempted to lock her in the first floor bathroom.  The victim struggled with the defendant as he continued to hit her.  He then told her to take her clothes off to which she said "no."  The defendant then pulled out a knife from the back of his pants and told the victim that he was going to kill her and disfigure her face.

Next, defendant took the victim into the kitchen, threw her on the floor, and ripped her clothes off.  Defendant bit the victim on the vagina, opened his pants, and began to sexually assault her.  He told her not to move or make a sound or he would kill her.  Defendant was interrupted when the victim's son and ex-husband knocked on her door.  The victim convinced defendant to let her answer the door to give her son a key, promising that she would return to him in the kitchen.  She put her clothes on, opened all of the locks and started yelling that defendant wanted to kill her.  The defendant left the knife on the kitchen counter and ran out the back door, hopping over the fence.  The victim's ex-husband observed him and chased him to no avail.  Defendant stole her passport, green card, pictures, jewelry, and money.  The victim's ex-husband called the police and after they arrived, defendant started calling the victim again.  One of the policemen talked to defendant and told him to give himself up to which defendant replied that he did not do anything to the victim.

According to the police reports, defendant contacted a friend who drove him to Miami, Florida.  Defendant was arrested in Miami

> when the police there learned of the warrant in Jefferson Parish.
> Defendant was extradited from Miami to Jefferson Parish.  After
> defendant was arrested, he continued to call the victim and he also
> wrote her a letter.  He asked the victim for her forgiveness for what
> he did, explaining that he had already asked God to forgive him.[15]

In light of such damning evidence, any reasonable individual in petitioner's situation would surely (and accurately) have found the prospect of proceeding to trial by jury to be cause for considerable concern.

Second, by agreeing to plead guilty and avoiding trial, petitioner was able to secure substantial concessions from the state.  By bill of indictment, he had been charged with charged with aggravated rape and aggravated burglary.  Those crimes carried severe potential penalties:  the mandatory penalty for aggravated rape was life imprisonment without benefit of parole, probation, or suspension of sentence; and the maximum penalty of aggravated burglary was thirty years imprisonment.  In return for guilty pleas, the state reduced the aggravated rape charge to forcible rape, petitioner's total sentencing exposure was reduced to only twenty years imprisonment, and the state agreed not charge him as a multiple offender.

Third, petitioner has failed to offer any proof that his counsel's alleged failures actually played a role in his ultimate decision to plead guilty.  For example, although petitioner vaguely complains that counsel failed to communicate adequately with him and his family and failed to properly investigate the case, he has not shown that better communication or investigation would in fact have resulted in the discovery of any additional information which would have benefitted the defense or affected his decision on whether to chance going to trial.  Moreover, while he states in

---

[15] <u>Vargas</u>, 66 So.3d at 32-34; State Rec., Vol. I of VI.

a conclusory fashion that evidence and witnesses were available on which to base a defense, he identifies neither any such evidence and witnesses nor a viable defense which could have been mounted.  Similarly, although he faults his attorney for giving misleading advice and for failing to file motions, he does not identify any *specific* advice which was misleading or motions which were warranted.  In the complete absence of such information and supporting evidence, there is simply no basis whatsoever for concluding that the alleged failures, *even if they occurred*, were ultimately of any consequence and actually affected his decision to plead guilty.

In summary, because petitioner's conviction at a trial could be anticipated with a high degree of certainty, he lost little by pleading guilty. On the other hand, he gained much: a guaranteed substantial reduction in his potential sentencing exposure. In light of those facts, as well as the complete absence of any concrete evidence that counsel's alleged failures actually affected the decision to plead guilty, the undersigned finds petitioner's allegation that he would have insisted on going to trial totally lacking in credibility.  For all of these reasons, it is clear that petitioner has not demonstrated that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## B.  Defaulted Claims

The state argues that petitioner's remaining two claims, i.e. that his guilty plea was involuntary and that his continued incarceration violates his right to due process, are procedurally barred.  For the following reasons, the state is correct.

- 17 -

The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

Here, there is no question that petitioner's remaining claims were denied by the state courts on procedural grounds. The state district court rejected the claims, holding:

> The court finds these claims procedurally barred from review in post conviction relief under. [sic]  If the application raises a claim the petitioner knew about, but inexcusably failed to raise prior to conviction, the court may deny relief.  LSA-C.Cr.P. art. 930.4(B).  Additionally, if the application alleges a claim that was raised at trial, but was inexcusably not pursued on appeal, the court may deny relief.  LSA-C.Cr.P. art. 930.4(C).  The petitioner's claims are barred because they could have been, but were not, raised in proceedings leading to conviction or on appeal.  Under LSA-C.Cr.P. 930.4, such claims should be denied.
>
> Furthermore, the court finds that under State *ex rel.* Rice v. State, 749 So.2d 650 (La. 1999), Petitioner's proper use of the Uniform Application satisfies the requirement of LSA-C.Cr.P. art. 930.4(F).  Petitioner's reason for not previously raising these claims on appeal, that "all are post conviction issues," is found to be insufficient and without merit.  The court finds these claims are procedurally barred from judicial review.
>
> Furthermore, claim #3 [that defendant's continued incarceration would be a violation of his rights] is not cognizable in post-conviction.  As LSA-C.Cr.P. Art. 930.3 provides,

> *If the petitioner is in custody after sentence for conviction for an offense, relief shall be granted only on the following grounds:*
>
> *(1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana;*
> *(2) The court exceeded its jurisdiction;*
> *(3) The conviction or sentence subjected him to double jeopardy;*
> *(4) The limitations on the institution of prosecution had expired;*
> *(5) The statute creating the offense for which he was convicted and sentenced is unconstitutional; or*
> *(6) The conviction or sentence constitute the ex post facto application of law in violation of the constitution of the United States or the state of Louisiana.*
> *(7) The results of DNA testing performed pursuant to an application granted under Article 926.1 prove by clear convincing evidence that the petitioner is factually innocent of the crime for which he was convicted.*

This claim is not cognizable for review in an application for post-conviction relief, and thus is procedurally barred from review.[16]

In ruling on petitioner's related writ application, the Louisiana Fifth Circuit Court of

Appeal likewise held:

> Based on the court application and exhibits before us, we find that the trial court did not err in denying relator's claims of an involuntary guilty plea and unconstitutional incarceration. Since relator would have known of the alleged threats that he claims induced his guilty pleas and resulted in his incarceration, both during the trial court proceedings and on appeal and failed previously to raise them, we agree with the trial court that these claims are procedurally barred from judicial review pursuant to LSA-C.Cr.P. art.

---

[16] State Rec., Vol. I of VI, Order dated March 15, 2012.

930.4.   We also agree that relator's claim that his continued incarceration is unconstitutional does not fall within an enumerated ground for which post-conviction relief shall be granted pursuant to LSA-C.Cr.P. art. 930.3.  Accordingly, we find these arguments are without merit.[17]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons;[18] however, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground."  Finley, 243 F.3d at 218.

Clearly, the procedural rules on which the state courts relied were "independent" and "adequate."  It is well-established that La. Code Crim. P. art. 930.4(B) and (C) are independent and adequate state court grounds sufficient to procedurally bar claims from federal *habeas* review.  See, e.g., Robinson v. Cooper, Civ. Action No. 12-1327, 2013 WL 2154011, at *5 (E.D. La. May 2, 2013); Brown v. Cain, Civ. Action No. 11-2267, 2011 WL 7042222, at *8 (E.D. La. Dec. 20, 2011), adopted, 2012 WL 123288 (E.D. La. Jan. 17, 2012); Thomas v. Cain, Civ. Action No. 11-2408, 2011 WL 6046536, at *5 (E.D. La. Nov. 17, 2011), adopted, 2011 WL 6028779 (E.D. La. Dec. 5, 2011); Young v. Travis, Civ. Action No. 07-3542, 2011 WL 494811, at *8 (E.D. La. Jan. 13, 2011), adopted, 2011 WL 494802 (E.D. La. Feb. 4, 2011); Jones v. Cain, Civ. Action No. 10-0187, 2010 WL 3312592, at *5-6 (E.D. La. July 29, 2010), adopted, 2010 WL 3312594 (E.D. La. Aug. 19, 2010); Green v. Cooper, Civ. Action No. 06-1657, 2009 WL 87590, at *10 (E.D. La. Jan. 8, 2009).

---

[17] State v. Vargas, No. 12-KH-341 (La. App. 5th Cir. May 25, 2012); State Rec., Vol. I of VI.

[18] State *ex rel.* Vargas v. State, 98 So.3d 853 (La. 2012) (No. 2012-KH-1358); State Rec., Vol. VI of VI.

Likewise, federal courts have long held that La. Code Crim. P. art. 930.3 is an independent and adequate state rule. See, e.g., Hull v. Stalder, No. 99-31199, 2000 WL 1598016 (5th Cir. Sept. 28, 2000); Johnson v. Cain, Civ. Action No. 12-0621, 2012 WL 5363327, at *4 (E.D. La. Oct. 30, 2012); Taylor v. Cain, Civ. Action No. 07-3929, 2008 WL 4186883, at *16 (E.D. La. Sept. 10, 2008); Williams v. Miller, Civ. Action No. 05-0086, 2006 WL 2087867, at *9 (E.D. La. July 24, 2006).

Where, as here, the state courts have rejected a petitioner's claim based on independent and adequate state procedural rules, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Petitioner has made no attempt in the instant case to establish cause. "Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

Because petitioner has not met the "cause and prejudice" test, this Court need consider these claims only if the application of the procedural bar would result in a "fundamental miscarriage of justice." However, in order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley, 243 F.3d at 220 (citations omitted).

Petitioner clearly has not made that showing in this case; on the contrary, he admitted his factual guilt under oath and the evidence of that guilt was in fact overwhelming.  Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

For these reasons, petitioner's two remaining claims are procedurally barred and should not be considered by this Court.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **Humberto Vargas** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[19]

New Orleans, Louisiana, this twenty-first day of October, 2013.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[19] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.